IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MISTY H.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 21 C 3717 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§416(I), 423, more than seven years ago in October of 2014. (Administrative Record (R.) 475-90). She claimed that he has been disabled since July 27, 2013, due to migraine headaches, chronic back pain radiating down the right leg, right wrist impairment, insomnia, and medication side effects. (R. 651). Over the next six and a half years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. Along the way, she went through multiple administrative hearings, ALJ decisions, and Appeals Council remands. It is the final ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on July 13, 2021. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on July 23, 2021. [Dkt. #11]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

Commissioner seeks an order affirming the decision.

### I.

### A.

Plaintiff was born on December 6, 1977, making her 35 years old when she claimed she became unable to work. (R. 475, 482). She has a decent work record, working steadily from 1996 through 2011. (R. 584-85). For most of that time, she was an "independent living" counselor at a group home. She has also worked as a dietary aid in a nursing home and, briefly, as a coil loader at a factory. (R. 677). She suffers from back pain and neck pain and has headaches two to three times a week, lasting three to four hours. (R. 58-59). She has taken several medications – topiramate, nortriptyline, ambien, trazadone. (R. 59-60).

The administrative record in this case is an all but unmanageable 4,056 pages; over 3,000 pages of that is medical evidence. (R. 808-4056). But as the plaintiff's arguments are focused on her headaches and the vocational evidence [Dkt. #22, at 10-15], we shall dispense with a tedious summary and focus on the evidence relevant to those issues.

Plaintiff reports that she has been having migraines or headaches since she was 20 years old. On September 11, 2013, the plaintiff saw Dr. Bahr, a neurologist, and reported that her headaches had worsened since the beginning of 2013. The headaches were associated with phonophobia, photophobia, and nausea. Sleep and Ibuprofen sometimes helped. She had been taking Amitriptyline for headache prevention, and headaches were not as debilitating as they had been. She continued to have them three times a week. (R. 953). Dr. Bahr's physical examination was normal. (R. 956-959). He noted a recent normal brain MRI. He prescribed Topiramate and Imitrex and hoped to wean plaintiff off Amitriptyline. (R. 959).

On December 1, 2013, the plaintiff sought treatment for headache with pressure behind her eyes, dizziness, and nausea. She thought this felt worse than her normal migraines. (R. 856). Physical exam was normal. (R. 858). CT scan of her head was normal. (R. 859). She was treated and released in no distress. (R. 860).

Two weeks later, plaintiff returned to Dr. Bahr complaining of chronic daily headaches with different characteristics from her usual migraines, with pressure over the temples. They did not improve with Imitrex. She was still have a migraine once a week. She was having side effects from her medications: dizziness, slow cognitive function, feeling strange. (R. 929). Dr. Bahr suggested that the claimant's headaches were likely due to overuse of Norco for back pain. The doctor stopped Imitrex and increased Topamax. (R. 930).

On June 25, 2014, plaintiff reported she was getting migraines two to three times per week that improved with Imitrex. She was no longer taking Amitriptyline. (R. 926-27). On September 14, 2014, plaintiff complained of headaches and insomnia over the preceding two weeks. (R.1055). The headaches were mild to moderate, about 5/10 or 3/10 with medication, from the time she wakes up until the time she goes to sleep. Headaches seemed to have been triggered by stress of court proceedings with her son. (R. 1055). Ambien was prescribed to help her sleep. (R.1057). By October 21, 2014, plaintiff reported her headaches and sleep had improved somewhat. Headaches were occurring three times a week. (R. 1059).

At the consultative exam in connection with plaintiff's application for benefits on January 28, 2015, plaintiff said she got three migraine headaches a week and the headaches could sometimes last all day (R.1130). She said she continued to have them despite taking Topamax twice a day. When she has a headache she shuts off the lights and lies down. (R.1133). On February 25, 2015,

3

Harris was examined by Dr. Mardor for her long-term disability carrier (R.1208-16). At that time, plaintiff said her migraines began two years ago. They were under control until October 2014 when her son was shot. Now she had 3-4 a week, with photo and phonophobia. (R. 1208). Dr. Mardor felt the migraines would completely limit patient's ability to work when they occur leading to regular absences. (R.1209).

Plaintiff next sought treatment for her headaches on December 21, 2015. At that time, she reported to Dr. Bahr that her headaches had improved in terms of both severity and frequency. But, that month, they had gotten more frequent and were lasting all day. Dr. Bahr increased the Topamax. (R. 1354). At an appointment on February 24, 2016, plaintiff reported she was doing better with her headaches after Topamax was increased. (R. 1336).

In October 26, 2016, plaintiff saw neurologist, Dr. Farooq. She said that her headaches had been under control until two weeks before, and that they improved most days, but sometimes they increased in frequency and intensity. She also reported that she was under a lot of stress, which increased her headaches. (R. 1351). Dr. Farooq recommended alternating between Sumatriptan and Fioricet to see which worked better, and counseled plaintiff on headaches from overmedication use. (R. 1352-53).

Plaintiff next saw Dr. Farooq on February 22, 2017, complaining of daily, dull, headaches around the eyes and drowsiness after taking Trazadone every night for sleep. (R. 1346). Dr. Farooq discontinued Trazadone, prescribed melatonin and counseled plaintiff on stress reduction and sleep hygiene. (R. 1348).

**B.**

After a final administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: migraine headaches, degenerative disc disease of the cervical and lumbar spine, status post-surgery, left wrist injury, obesity, and asthma. (R. 18). The ALJ Noted that there was evidence of an adjustment disorder, but found that it was not a severe impairment because it caused only mild limitations in concentrating, persisting, or maintaining pace, and in adapting or managing oneself. (R. 18-19). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically considered the requirements for the Listings 1.02 (Major dysfunction of a joint), 3.03 (Asthma), and 11.02(considered as to migraines). (R. 19-20).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to perform sedentary work except:

> handle and finger frequently with the left hand; never climb ladders, ropes, or scaffolds; never work in weather, humidity or wetness; never be exposed to dust, odors, fumes and pulmonary irritants; never work in extreme cold or extreme heat and limited to moderate noise.

(R. 20). The ALJ then reviewed plaintiff's allegations and activities. He then found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 21). The ALJ summarized the medical evidence, discussing treatment and clinical records for plaintiff's migraines, and back and neck

5

impairments, and asthma. (R. 23-26). The ALJ limited the plaintiff from noise to accommodate her migraines, noting it was a longstanding impairment that she had worked despite in the past. (R.23). He restricted the plaintiff from pulmonary irritants to address her asthma, and restricted her to sedentary work due to her back and neck issues. (R. 23-26).

As for medical opinions, the ALJ afforded "some weight" to the opinions of the state agency reviewing physicians who found plaintiff could perform medium work. But, the ALJ said the evidence as a whole was more consistent with a limitation to sedentary work. (R.27). The ALJ gave "some weight" to the opinion from treating physician, Dr. Jain, who said plaintiff was capable of sitting for 45 minutes at a time, standing for 45 minutes at a time, walking eight blocks, and lifting 15 pounds with the right hand, but nothing with the left. The ALJ felt the doctor's assertion that plaintiff could not lift with her left hand inconsistent with the doctor's finding that her strength was only partially diminished in that hand. The ALJ also rejected Dr. Jain's opinion regarding limited sitting, standing and walking appears as it appeared to be based solely on plaintiff's subjective allegations; exams showed normal neurological functioning, and no difficulty hopping on one leg or in toe or heel walking. (R. 27).

The ALJ gave "partial weight" to Dr. Marder's opinion. The ALJ incorporated some of the doctor's limitation into the restriction to sedentary work, but rejected said the doctor's limitation to fifteen minutes of standing as not supported based on the lack of neurological deficits, plaintiff's treatment, and activities. (R. 27). The ALJ felt Dr. Marder's opinion as to migraines causing regular absences was not supported because the evidence showed that the plaintiff improved with medication, worked at levels of SGA despite her migraines, and did not receive treatment for the stress that she alleged increased her migraines. (R. 28).

6

The ALJ then found that plaintiff was unable to perform her past work because it was too strenuous given her residual functional capacity for sedentary work as an industrial truck operator, based on the testimony from the vocational expert. (R. 32). Then, again relying on the vocational expert's testimony, the ALJ found that plaintiff could perform other work that existed in significant numbers in the national economy. Examples of such work were: information clerk, DOT code 237.367-046 (70,000 jobs in the national economy); document preparer, DOT code 249.587-018 (45,000 jobs) and order clerk, DOT code 209.567-014 (24,000 jobs). (R. 29). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 29).

## II.

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The substantial evidence standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an accurate and "logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Jarnutowski v. Kijakazi*, _F.4th_ (7th Cir. 2022), 2022 WL 4126293; *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build a "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). *But see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a certain lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an

expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek he can hop across on a rock or two. In any event, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). In the end, it is sufficient for ALJs to "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[2]

---

[2] Prior to Sarchet's "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that the ALJ had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79.

In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

(continued...)

The ALJ has done enough here.

### III.

Plaintiff raises two arguments in favor of overturning the ALJ's decision denying her application for benefits. First, she contends that the ALJ erred in failing to include any limitations reasonably related to her severe headaches in his RFC finding. Second, she submits that the ALJ's finding that she can perform work that exists in significant numbers in the national economy is not supported by "substantial evidence." Any other arguments plaintiff might have raised but did not are deemed waived. *Grove v. Kijakazi*, No. 21-1980, 2022 WL 1262131, at *2 (7th Cir. Apr. 28, 2022); *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

### A.

The plaintiff begins her critique of the ALJ's consideration of her headaches by claiming that:

> An initial problem with the ALJ's finding vis-à-vis Plaintiff's headaches is that there is no correlation between Harris's well established headaches and the limitations to sedentary work with moderate levels of noise (in fact, at the hearing, the ALJ posed noise limitations to the VE in the context of a hearing problem, not in relation to her migraines [R.69]). In fact, there is no evidence indicating that noise causes her headaches.

[Dkt. #22, at 10]. But the ALJ relied on the opinion from the state agency reviewer, Dr. Madala, who said the claimant should avoid concentrated exposure to noise. (R. 27, 179-180). It was entirely

---

²(...continued)
*Stephens*, 766 F.2d at 287 (citations omitted).

    Much more recently, the Seventh Circuit explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

appropriate for the ALJ to have done so; ALJ's may reasonably relied on opinions from the state agency doctor who reviewed the record. *See Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021); *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019); *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002). And plaintiff is mistaken about the evidence. Plaintiff herself told her doctor the long-term disability examiner that she experienced phonophobia. (R. 953, 1208). Plaintiff even concedes as much in her brief. [Dkt. #22, at 4, 11].

Plaintiff next argues that the ALJ's RFC must contain limitations reasonably related to her headaches, and that means being absent from work at least three days each month. In support, the plaintiff submits that the record consistently shows her reporting headaches more frequently that three days a month. [Dkt. #22, 11-13]. There are, as the plaintiff claims, several reports of headaches more frequently than three days a month:

    September 11, 2013: three times a week (R. 953)

    December 11, 2013: once a week (R. 930)

    June 25, 2014: two to three times a week (R. 926-27)

    October 21, 2014: three times a week (R. 1057)

    January 28, 2015: three times a week (R. 1130)

    February 25, 2015: three to four time a week (R. 1208)

    December 21, 2015: frequently all day (R. 1354)

But, the ALJ saw the record differently, and "consistently" might be a bit of an overstatement. There are, of course, a number of periods during which plaintiff sought no treatment. And, in addition to those periods, there are at least a few reports where plaintiff reported improvement or that her migraines were under control, often for extended periods:

>October 21, 2014: improved (R. 1059)

>February 25, 2015: under control from 2013 through October 2014 (R. 1208)

>December 21, 2015: had been improved (R. 1354)

>February 24, 2014-October 26, 2016: doing better, headaches under control (R. 1336, 1351)

Additionally, in assessing the ALJ's view of the record, it must be remembered that it is the plaintiff's burden to prove with medical evidence that her headaches are disabling. *Gedatus*, 994 F.3d at 905; *Karr*, 989 F.3d at 513 (7th Cir. 2021)(plaintiff must "identify[ ] ... objective evidence in the record" that she is disabled); *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010). Subjective complaints – such as "I get headaches three times a week" – are not medical evidence; they "are the opposite of objective medical evidence . . . ." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). They cannot, alone, carry the day. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability...."); 20 C.F.R. §§ 404.1529(a); 416,929(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled.").

All this is not to say that plaintiff is lying or that her view of the record is wrong. While migraines are a chronic condition, they are not constant in the way a heart condition or osteoarthritis would be. A doctor may never observe them in order to assess their effect; here, for example, there appears to be just one occasion in four years where plaintiff sought treatment while experiencing a headache. As such, the nature of the impairment makes review of the record difficult for the ALJ and the reviewing court. Simply put, the record here allows for more than one interpretation. When that is the case, the substantial evidence standard requires the ALJ's view to be upheld. *McGillem v. Kijakazi*, No. 20-2912, 2022 WL 385175, at *1 (7th Cir. Feb. 8, 2022)("Although this is a close

case, we conclude that substantial evidence supports the ALJ's decision, and so the applicable standard of review compels us to affirm."); *Zoch*, 981 F.3d at 602 (". . . even if reasonable minds could differ on the ALJ's rejection of [plaintiff's allegations] testimony, we will not reweigh evidence or substitute our judgment for the ALJ's."); *Karr*, 989 F.3d at 513 (same); *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019)("Where substantial evidence supports the ALJ's disability determination, we must affirm the decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled'."); *Johnson v. Berryhill*, 745 F. App'x 247, 251 (7th Cir. 2018)( resolving the conflicting evidence is a job for the ALJ in the first instance).

Moreover, the ALJ made at least a couple of additional points that support his interpretation of the evidence. Plaintiff said she has had this condition since she was twenty years old. Thus, as the ALJ noted, she has worked despite it for a number of years. He was entitled to consider that in his assessment of the effects of her condition. *See, e.g., Prill v. Kijakazi*, 23 F.4th 738, 747 (7th Cir. 2022); *Overton v. Saul*, 802 F. App'x 190, 193 (7th Cir. 2020)(longstanding migraine condition); *Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008) (conditions with which a claimant was able to sustain substantial employment do not support disability claim). The ALJ also properly considered the evidence that medication alleviated her headaches and that misuse of medication might have caused them. *Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021)(regulations contemplate that an ALJ will consider a claimant's treatment history); *Arnold v. Saul*, 990 F.3d 1046, 1047 (7th Cir. 2021). Taking all this into account, and in view of the record, we cannot say that the ALJ's conclusion was not supported by "substantial evidence."

**B.**

The plaintiff next contends that the ALJ's finding that she could perform a significant number of jobs in the national economy was not supported by substantial evidence. To make her point, the plaintiff does a little whittling of the job figures the vocational expert testified to. The vocational expert said there were 70,000 information clerk jobs in the nation, 45,000 document preparer jobs, and 24,000 order clerk jobs. The plaintiff claims that almost half of all these jobs are part-time, but does not explain why she thinks that. [Dkt. #22, at 14]. But, in any event, after a fair amount of statistical legerdemain, plaintiff arrives at 18,240 jobs as a reliable figure for the number of jobs in the country that she can perform given her RFC. [Dkt. #22, at 14]. Next, the plaintiff submits that the total number of jobs in the United States in February 2019 was 150,606,000, relying on a website called "Department of Numbers." [Dkt. #22, at 14]. Resort to the Bureau of Labor Statistics might have made more sense as an official source; but no matter. The point plaintiff wants to make is that 18,240 jobs represents just 0.012% of all the jobs in the United States. That, she argues, cannot be regarded as a significant number. [Dkt. #22, at 14].

Accepting plaintiff's statistics and arithmetic for the sake of argument (she arguably waived her challenges to the vocational expert's numbers by not making them at the hearing), the problem is that appellate courts around the country do, in fact, regard 18,240 jobs nationally as a significant number. *See, e.g., Sanchez v. Comm'r of Soc. Security*, 705 F. App'x 95, 99 (3d Cir. 2017) (finding 18,000 jobs in the national economy significant); *Taskila v. Comm'r of Soc. Security*, 819 F.3d 902, 905 (6th Cir. 2016) (finding 6,000 jobs in the national economy significant); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (finding 10,000 jobs in the national economy significant). *Compare Gutierrez v. Comm'r of Soc. Security*, 740 F.3d 519, 528-29 (9th Cir. 2014) (finding 25,000 jobs in

14

the national economy significant). The Seventh Circuit is a little harder to pin down on this point, but distilling its holdings down to their essence – and utilizing plaintiff's methodology – 18,000 or so jobs appears pretty significant.

The Court of Appeals addressed the question of what amounts to a significant number in *Liskowitz v. Astrue*, 559 F.3d 736 (7th Cir. 2009), where the issue was whether 4,000 jobs in the Milwaukee area were significant. The Court's observations are not to be ignored:

> As few as 174 jobs has been held to be significant, *see Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir.1987), and it appears to be well-established that 1,000 jobs is a significant number. *See Lee*, 988 F.2d at 794; *see also Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir.1988) (1,350 jobs); *Barker v. Sec'y of Health & Human Servs.*, 882 F.2d 1474, 1479 (9th Cir.1989) (1,266 jobs); *Trimiar v. Sullivan*, 966 F.2d 1326, 1330–32 (10th Cir.1992) (850–1,000 jobs); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir.1988) (500 jobs).

559 F.3d at 743. Importantly, these are regional or local economy job figures rather than national job figures. But the cases the Seventh Circuit cited with approval tend to undermine plaintiff's position, at least in terms of the relationship between the Step Five job number and the economy. In *Allen v. Bowen*, the court found 174 jobs in the state of Georgia to be significant. At that time, according to the back data at the Bureau of Labor Statistics website, there were 2,856,439 jobs in Georgia. https://www.bls.gov/regions/southeast/georgia.htm#eag. That renders a percentage figure of .0061, or about only half of the figure plaintiff argues is insignificant.

More recently, in *Mitchell v. Kijakazi*, No. 20-2897 (7th Cir. July 22, 2021), the Seventh Circuit suggested that "as few as 1,000 positions nationally are sufficient occupational base", citing its holding in *Weathered v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011). 2021 WL 3086194, at *3. However, it appears the *Weathered* court quoted that number in terms of *local* job statistics. 649 F.3d at 572. But, in any event, the court said 493 jobs would be a significant number in Indiana.

15

Back data shows that there were about 2,900,000 total jobs in Indiana around that time, resulting in a percentage figure of .017. That's close enough to plaintiff's figure to suggest that level is not so insignificant as to torpedo an ALJ's finding at Step Five.[3] But, to a large degree, we've "buried the lede", and there is an old joke about people going to law school because they were told there would be no math.

Against the foregoing cases, the plaintiff cites a single case from the Northern District of Indiana, *Sally S. v. Berryhill*, No. 2:18-cv-460, 2019 WL 3335033, at *11 (N.D.Ind.July 23, 2019). There, the court held that 120,350 jobs in the entire nation – or 0.080% of jobs – was not a significant number. *Id.* at *11. But, the court in *Sally S.* engaged in no analysis other than simply accepting plaintiff's numbers and argument. Additionally, the court did not consult a single case on the subject. As such, the holding has little or no authoritative value. *Alexander v. City of Chicago*, 994 F.2d 333, 339 n.5 (7th Cir. 1993)(value of opinion is impaired by its perfunctory analysis); *Szmaj v. Am. Tel. & Tel. Co.*, 291 F.3d 955, 956 (7th Cir. 2002). Indeed, the judge who authored it has disavowed it. *Jennifer K. v. Kijakazi*, No. 1:21CV68, 2022 WL 766164, at *4 (N.D. Ind. Mar. 14, 2022)("*Sally S.* was decided in 2019 and, quite frankly, has proven unworkable in the ensuing years. Thus, later decisions from this Court have retreated from the *Sally S.* holding."); *see also Jody 'G. v. Kijakazi*, No. 1:21CV70, 2022 WL 766166, at *4 (N.D. Ind. Mar. 14, 2022). The judge now defers to the ALJ's finding "unless the number of jobs identified by the VE is startling low." If the

---

[3] In a similar vein, the court in *Stanley v. Astrue*, 410 F. App'x 974, 976 (7th Cir. 2011) also suggested that 1,000 jobs was a significant number in terms of the *national economy:*

> " '[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.' " . . . We have held that when a person can perform 1,000 or more jobs, then work exists in "significant" numbers. *Liskowitz*, 559 F.3d at 743; *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir.1993).

judge who wrote the only opinion the plaintiff has to support her argument doesn't even follow it, why should anyone else?

## CONCLUSION

For the foregoing reasons the ALJ's decision denying plaintiff's application for benefits is affirmed.

ENTERED: *[signature: Jeff Cole]*
UNITED STATES MAGISTRATE JUDGE

**DATE:** 9/13/22